May it please the Court, Providence Behavioral Health and Texas Providence Investments, the plaintiffs in this matter, are building a psychiatric facility for children with disabilities. In particular, these children have autism, bipolar disorder, and similar disabilities. In order to construct this facility, the plaintiffs, of course, need utility services, water, septic system, and the like. Because the land on which they're building the facility is not already served by a public utility district, they have sought annexation from defendants, the Grant Road Public Utility District and the board members of that district. May I ask a question, which is, this dispute has been going on for nearly a decade, and at some point, I realize Providence didn't receive its alternative certification from Harris County or whatever, and has undertaken to build a processing plant, right? That's correct, Your Honor. So why do you persist in this lawsuit? The approval was just given by the Texas Commission on Environmental Quality very recently to build a package plant. The difficulty with the package plant is twofold. First, it's extremely expensive to build it. The second thing is that in building the package plant, the site would be dramatically different from what it would look like. The plaintiffs would be unable to provide the same level of service to their clients using the package plant on the grounds as they would be if they had a hookup through the utility district. They'd have to have this massive plant providing utility and septic services right in the middle, so they'd have to alter the very construction of the grounds. And let me ask you another question. The district court didn't rule on the Eleventh Amendment issue. That's correct, Your Honor. And why is that? I believe that the district court didn't rule on the Eleventh Amendment issue because the district court believed erroneously that it had done everything it needed to do by determining that there was no intentional discrimination on the part of the defendants, therefore it need not reach the sovereign immunity issue. Well, of course, that's jurisdictional, so I'm concerned about that. I realize you also sued the defendants individually. Yes, Your Honor. There might be some way you could wire around the Eleventh Amendment, but anyway, without telling you how to argue your case, I am interested in that issue as well. And I'll address that issue now, Your Honor. The Americans with Disabilities Act has, through Title II, has specifically abrogated the sovereign immunity of the states through 28 U.S.C. 12132. The cases that have indicated that there has to be an extra analysis to determine whether that abrogation is constitutional have all dealt with damages cases. US v. Georgia and Hale v. King in this court were all damages cases. In Hale v. King, there had been a claim for prospective injunctive relief, but that had been dismissed as moot by the time that this court was reaching the issue. I think that the reason why most of these cases are damages cases and there haven't been a lot of cases that deal with the issue of whether the ADA can abrogate sovereign immunity specifically with respect to prospective injunctive relief is because, in cases like this one, there generally is an ex parte young suit available to the plaintiff, such as the one that we have here. In this case, the board members are individual defendants in their official capacity. The plaintiffs have sued them in their official capacity. The entire reason why there's an ex parte young doctrine is to provide for exactly that mechanism. So you're basically saying you either win on the abrogation under the ADA, that doesn't cover the Texas Fair Housing Act or the 14th Amendment, so if you win on the ADA, it's moot point. Otherwise, you've got your ex parte young on the other issues. That's exactly right, Your Honor. So the FHA does not abrogate the sovereign immunity. So in order for us to win on the FHA, we would have to win on ex parte young grounds, and that would hold true for the ADA as well. So it's unclear whether there's a lot of purchasing. So at this point, you're still going after injunctive relief and not monetary damages. That's exactly right. Monetary damages have never been an issue in this case. We've never sought monetary damages. The only issue is should there be appropriate prospective injunctive relief provided by the defendants in this matter, which could be either annexing the property or specifically providing utility services, either one of which the Texas Water Code permits the defendants to do. As I noted in my comments with respect to Your Honor's question, the district court below believed that it had resolved all issues necessary to this case by determining that the defendants had not intentionally discriminated against plaintiffs in this matter and against the disabled population that plaintiffs would serve, but the only reason, in the district court's opinion, for making that determination, and this is the reason given on all counts for all claims, is that the district court believed that the plaintiffs had presented no evidence that there had ever been a similarly situated facility annexed by the defendants before. Aren't you asking, isn't Providence asking, when we say annex, the Grant Road PUD doesn't provide service there, I think you said that at the outset, so you're asking them for a favor, isn't that correct? You're asking to extend their services into an area they don't normally service when you say annex. Isn't that what we're asking for? That is certainly what we're asking. I mean, it's not something that you would have a right to otherwise. You're asking for permission, and you're saying that permission is declined based on some discriminatory motive. That's absolutely correct. That the argument, but they approved it in 2009. I beg your pardon? Didn't they approve in 2009, give some sort of preliminary approval? Isn't that evidence of a lack of discriminatory intent that they were willing to entertain that project? But maybe the better question is, isn't the project that you, that was declined, substantially different than the one that you submitted in 2009? And in fact, the fact that they, that the board agreed to annex the project in 2009-2010 is evidence that they do have a discriminatory motive now, not that they didn't, not that they don't have a discriminatory motive. And the reason is that the board members themselves, perhaps, do not have some sort of antipathy for the disabled. And the plaintiffs have never argued in this case that the board members individually harbor some sort of distinct animus against the disabled, not at all. And in fact, the fact that they agreed to annex in 2009-2010 preliminary is evidence of that fact. But. That was my point. Right. That they were willing to entertain, in fact, to grant approval, at least preliminary approval, for the project as designed in 2009. When all of the factors that you're arguing they are now discriminating against, those factors were present, the size and the nature of the facility, maybe the scale was different when Providence came back later. And, and the, the defendants have never argued. They never presented when, when the board members came and testified at trial. They never offered as a reason for why they had changed their mind the fact that there were any kind of differences in the size, the scale, the nature of the project. It was financial reasons, is that correct? Well, the, the, the financial reasons would have been the same reasons as would have been the case in 2009-2010. So, so Jack Scott, for example, the secretary of the board said, well, there might be a tax abatement possibility. They never, they never asked whether there was a tax abatement possibility. In fact, plaintiffs are not a, are not a non-profit organization. There is no tax abatement specter. That's exactly what one or two questions at the board meeting could have uncovered. The real difference between 2009 and 2010, your honor, is that in 2014, the summer of 2014, there had been a lot of community pressure brought to bear on the board. And there had been discussion in the community about the fact that a disabled population there would bring down the economic values of the property. And these, and, and the other factor in the summer of 2014 is that for the first time since 1974, so this is exactly 40 years, for the first time in 40 years, there was a contested board election. And the, the attorney for the board admitted to my client in about September of 2014 or October of 2014 that the board was very sensitive to these issues, very sensitive to community pressure, and that it probably wouldn't be wise to re-abroach these issues until November of 2014 after the bond election. There were no questions about, well, you know, there's a few more beds this time around. There were no questions about, well, you know, is it somehow different in nature? Because it wasn't. None of the kinds of issues that were different between the 2014 version and the 2009-2010 version had any difference, made any difference at all as to the look of the project, as to the requirements of the project with respect to water utility access, anything like that. The, so the district court, though, didn't make anything out of that either. The district court simply said, well, you, you haven't presented evidence that there was ever any similarly situated project that was accepted. But of course, as Your Honor has already pointed out, there was evidence, namely us. My clients had already presented an exactly similarly situated project in 2009-2010, and the board had accepted it. Now, because of this community pressure in 2014, the board is all of a sudden very same board members, not one single change in the board. That board is now rejecting the project. And just informationally, what were the other options in terms of obtaining surge treatment and the type of public utility service that you're seeking from the, from Grant Road? What were the other options at the time? The other options. There was like a self-contained. You could have a well and septic system. But, in fact, Robert Krushkowitz, the president of the board at one point or another indicated, well, that's the reason that I said that I didn't want to annex it because they could have had a well and septic system. But, of course, every single, you know, single family residential, you know, could use a well and septic system also. Anybody could use that. Was there another utility district that could possibly have annexed as well? There wasn't one. My understanding is there wasn't one as close. The Grant Road Public Utility District literally has lines right across the street. It's, for the Grant Road Public Utility District to hook it up, they literally just have to run the lines right there. That's the utility district that they have immediate access to. I don't believe there was another utility district that is in easy range that could have provided the same service. The only other option that I'm aware of is the package plant issue that Judge Jones was asking about. And that is, not only is it dramatically expensive, but it also changes the complexion of what they're trying to serve. So, yes, if it were a small matter, then my clients would definitely have begun construction because they're losing revenue. They're losing their opportunity to serve their clientele. If it were a small matter just to put in a package plant, there's no reason to go through this sort of extensive litigation. But it's not a small matter. If your clients were to change their business proposal and say they were going to, what's this, 70 acres? How many acres is this? I think that's about right. I don't have the exact acreage in front of me. I don't remember at the moment, but they could build a few houses on that property. So if they changed it to a small residential development, do you think they'd get approval or annexation? Yes. If my clients decided to say, okay, you got us. We're not going to build a psychiatric facility for kids with autism or bipolar disorder here. We're going to build a single family residential unit on here. I absolutely believe that they would get annexation. Precisely because this board has never, in 40 years, has never, until my clients came around, has never denied a request for annexation. And that, in fact, is part of the issue under the Arlington Heights factors which the district court never applied at all. The district court thought it was dispositive that while there hasn't been a similarly situated applicant rejected. Let me ask you a question. I know you're running out of time, but you'll have time to answer the question if you can. My understanding, this is a bench trial, right? So, you know, unlike a decision on a summary judgment or whatever, I mean, it's all out. And I'm assuming there's no assertion here of error in the sense of we didn't get to put this evidence in by the body. I mean, everybody got in, I presume, whatever the licks they wanted to get in. Is that a fair statement? That is a fair statement, Your Honor. All right. Now, my understanding, and I haven't read the record, but my understanding that in rebuttal to your client's claim about, you know, the discriminatory anima started out a reason for it now that the defendants put on some evidence to say there were these huge or whatever negative financial impacts that would have resulted from approval. And while it's my further understanding that the board didn't give any reasons, they just unanimously denied it. My question is, and I know you got a short time, but I reasonably believe he was going to mention it. So I mentioned to you now for an answer, and of course you'll come back on rebuttal. So, but just give me the thumbnail on the negative financial implications that they said would be so pervasively negative that that sort of, from their standpoint, the real reason for the denying. The only understanding that I have of a non-discriminatory financial impact that the defendants have ever claimed was that, was the same claim by Robert Preshkowitz and Jack Scott that there was a possibility of a tax abatement because plaintiffs or designers who construct this kind of facility are often non-profit and often claim tax abatements. In this case, they never asked any questions, and that's not the case. My clients have always been willing to pay the taxes. They're not non-profit. And so there'd be absolutely no financial problems there. The only other financial disaster that I'm aware of that the defendants have ever claimed, and this is one that was discussed by John Wallace, the attorney for the board, is that the property values might be brought down by the existence of a population of disabled individuals. But that, of course, is a discriminatory motive. That, of course, is precisely the kind of thing that the ADA and the FHA are designed to prohibit. Thank you. Thank you. That's helpful. And if it comes up again, you have a bottle. You have another shot at it. All right, Mr. Hindershot. May it please the court. Good morning, judges. My name is Simon Hindershot, and I represent the appellees in this matter, all of the defendants at the trial court, Grant Road Public Utility District, and the various board members who were named in their representative capacity. We're here today as a result of appellants' consistent request for relief, to which they are not entitled. Judging the court as you asked my colleague previously, the property that is in question lies outside of the boundaries of our district. So they approached Grant Road Public Utility District asking for a favor,  because there was nothing that compelled Grant Road Public Utility District or the board members to grant the annexation. So when they were properly denied, the owners of the appellants, businessmen, none of whom are affected by any disability, brought suit in the district court, alleging discrimination. And after a complete trial, after the trial court heard all of the evidence and was able to consider all of the evidence, the trial judge made specific findings based upon all of that evidence that there was no discrimination. How many denials had there been in the last, I don't know, I think we mentioned 40 years earlier? How many denials had there been of applications for annexation? There had not been many. And I believe in the transcript with respect to commercial entities, there were two. But then again, you look at the amount of annexations that had been granted, the two denials amounted to about 20% of those who had asked for annexation. Do you have information, was there information presented as to the reason for those two prior denials? That is in the Record on Appeal at 1524, one of which was Mr. Wu. And at the time of trial, no one could remember the reasons that that annexation was denied. It was just, I believe that it, Mr. Wu, I think there's testimony that it just went away. And the other annexation that was denied was the Tall Pines Project. And the annexation did not occur because it would not have been financially feasible. And that testimony was from the board president, Mr. Korekiewicz, and I know I'm mispronouncing his name, but that is specifically in the record and in the findings. That's the- What does it mean to say not financially feasible? That was the only testimony, is that it was not financially- I know that, but that was something that was trotted out against Providence also, not financially feasible. I mean, all you have to do is, you know, dig a hole, get the pipe of the right size, the pipes of the right size, and connect them to the final project. So what makes something like that not financially feasible? Well, when you look at the tax revenue that's going to be generated on it, how long does it take before those dollars are returned? Don't you charge them a hookup fee, don't you? You charge an initial hookup fee, but then there's still the tax revenue, and that was one of the issues. But I don't understand, because once you hook them up, the quote, I mean, you're charging them every month for the water, right? Charging for the water. And the amount of the water, you're a public utility, so that whatever you charge for the water has got to include- I mean, I think you're a public utility, maybe not, but whatever your district is charging for the water includes a reasonable commercial fee, which includes capital improvements and depreciation and so on. So I don't see why the taxes does anything except buy coffee and cookies for the board meetings. Well, as you just indicated, Judge Jones, there is the depreciation, there's the ongoing maintenance. We have to pay to keep our plant operational and within the appropriate code. So there is ongoing expense associated with it. Well, of course there is, but you charge the users. Yes, ma'am, and the ability to pay that usage. And that's something that was specifically testified to in this particular case of how there was concern of a startup entity and whether or not that entity would be successful. And I guess my view about that is, so what, because not every entity is successful. And once you have the property, you've got the water hookup. If they fail, they're not going to use the water and pay the bills. That is correct. But it is Harris County and property. I mean, you don't incur any costs on this land, even if it's totally undeveloped or developed and in foreclosure. You don't incur costs if you're not supplying water. But we do need that tax revenue being paid in order to maintain the facilities that are necessary to provide that water, as you just indicated, the depreciation. But if you're not giving them any water, then you're not losing money, you know, because they're, if they were to fail. But if we were to annex that facility and in this particular case, if it had 35 homes on it, what we would be able to make from that tax revenue would offset the other expenses that have to be paid by other members of the district with respect to the ongoing maintenance. Well, I understand that, but I don't understand, I don't understand your financial feasibility argument in this connection. In other words, your base of taxpayers would be the same with or without that facility. Our base of taxpayers? And they know, and your taxpayers know that they have to pay for the ongoing, you know, the bond issue or whatever it is in case you have to comply with new EPA regulations or whatever. Those taxpayers within the boundaries of the district would remain the same, yes, ma'am. But then what you're doing is you're putting an additional burden on those taxpayers within the district if we have expanded through annexation. I don't understand that. Again, there is the cost of... I don't want to waste your time, but I'll look in the record about that. Yes, ma'am. Judge Engelhardt, to address one of the questions that you ask and the statement that was made with respect to the concern in the public and to the comments that John Wallace, the attorney for the board, made, my colleague indicated that the public concern was over the disability of the various potential clients. That is not what the record indicates. In reviewing the record on appeal in its entirety, there is no testimony, no evidence that the public concern was as a result of anyone with any disability that would be in the facility. Specifically looking at Mr. Hill's testimony, the record on appeal, page 1837, he was the original investor that helped purchase the land. The discussion in the record on appeal about the conversation that took place with Mr. Wallace and Dr. Valdez at the record on appeal 2143, it's simply that the board was sensitive to public perception, nothing about what that perception was or what was causing it. Clearly there could be concern in the public about any commercial entity going in and the effect that it would have on property values. So that was a misstatement as to what the record contains. So I did want to address that. In looking at what the trial court heard at the time of trial, the trial court heard the testimony and evidence similar to the argument that was made here today and the trial court specifically rejected that. Let me ask you this. It's my understanding that when the board denied it, there were no reasons given, correct? No, sir, there were reasons for denial given. Specifically, Mr. Scott testified that he felt that the- Well, let me back up. I mean, I know that there was testimony and I've got just some notes on what the testimony, but I'm like, just like here when the court rules, you know, it gave its rulings. And I'm saying given the history where this facility had been there before and so on and so forth and all that, there was all the scuttlebutt about the neighbors didn't, you know, want it there and somebody potentially spreading negative information, et cetera. So I know what the testimony in the trial is. I'm talking about when the board met, you know, was there a, we deny your application because, setting forth a tax abatement problem, you have a poorly developed plan, you know, whatever, whatever. I'm back at the board determination, not the trial. Do you understand what I'm asking? Yes, sir. The way I read the briefs from the plaintiffs was that the board didn't ask any questions during our presentation. You know, there were people turning their back, not paying attention, yada, yada, yada, and all this other stuff. Ergo, the reason that we were denied was because they discriminated against us. There was no articulable objective reason given just thumbs down unanimous. And that's why I'm asking, even back to the early ones who said denied, was it the board's practice? Would it now, you know, give some kind of reasons, whether they're real reasons or not, for it now, or just say no and leave the person to wonder what the underlying purpose was? You follow me? I believe I understand your question, Judge Stewart. And you are correct. At the time of the presentation, the board did not say, we are denying your request for annexation because of one, two, three. But then, in reality, the board is not required to say, we are denying because of one, two, three. Well, I understand that. But, I mean, I assume that. But you're relying on what the board members testified to in the trial to say, well, what the trial judge found is the evidence. They say we preponderated in establishing our claim. So we got to look at the evidence. So you've got somebody, when asked about, you know, did the nature of the patients have something to do with it? No, it didn't. And then there was the business about the tax abatements and it might lower the financial base and all. And always a skeptical person may say those were, what's the word for it? Post hoc, you know, determinations of why not, when you're faced with a trial, having to justify why you denied it. Whereas at the time the presentation occurred, there were no reasons given. I didn't say you had to, but I'm just looking at it. The plaintiffs got their burden and they're saying they didn't tell us when we were in the room, they didn't ask us any questions. You know, they just kind of listened and at the end of it gave thumbs down. We sue them. Now at trial, they bring out a seriatim of reasons, supposedly, about which were the real reasons it was denied. Then they say discrimination. And so we get it looking at it and you want to argue deference to the trial court, which I get. But in trying to figure out, you know, what is it, if the board never really said, particularly if you've got a persistent plaintiff, you know, sometimes giving them some reason. Do you understand where I'm going here? Can you just rest on deference to the trial court in the face of, you know, the heavy duty claims of discrimination, et cetera, when in looking at the record and board proceedings, it doesn't, you know, look like any of that was unpacked so that they could have addressed whatever the deficiencies were. So in other words, if they had a deficient financial plan, were they told that? So they could say, okay, we'll be back with the CPA to firm it up. Well, quite honestly, they weren't given that. The board was not given that opportunity because what happened is, Judge Stewart, you're absolutely correct. At the time of the September board meeting, the board said denied. After that board meeting, Dr. Valdez called John Wallace, the attorney for the board, and Mr. Wallace said, well, there was these public concern issues, and Mr. Wallace identified issues. But then the board received a demand letter and a copy of a complaint saying, we're about to sue you. And at that point in time, all discussions ended. But I thought you had another board member meeting in November. There was the subsequent board meeting, and that is when they had already received the demand letter saying, we're going to sue you with a copy of the complaint. And just as an attorney advising a client, when somebody tells you they're going to sue you, you tell your client, be quiet. So as not to create any additional issues. And so that's the history and the sequence of events. But Judge Stewart, you're absolutely correct that we have to give deference to the findings of the trial court. And where you were going in your discussion a moment ago, I think the critical words you were looking for is, were these reasons pretextual? And that's exactly what is in the purview of the trial court. And as this court has specifically held, the trial court is the trier of fact. The trial court sees the demeanor of the witnesses. Here's the discussion. Here's the inflections of the tone of the voice. And so the trial court is the one that makes the determination of were these reasons that were given pretextual or not. And it goes to the credibility. This court held that in quarter v. Maloney Trucking and Storage, 631 F. Second 40. And so that's exactly what the trial court has done. The trial court heard both sides of the testimony. The trial court had to make a determination of which witness was credible, which witnesses were credible. The trial court had to choose and make a choice as to what the true findings were. And as the Supreme Court has mandated to us, when the trial judge makes a determination to choose between two witnesses as to which witness is telling the truth, then that decision cannot be clearly erroneous when there is evidence in the record that would support that decision. And here we had substantial evidence in the record because Mr. Scott had testified that he felt like the presentation that was given was sloppy. It didn't contain any facts and figures. Can we compare the testimony, the events of the meeting itself compared to what they said at this bench trial? I mean, for instance, my understanding, correct me if I'm wrong, Dr. Valdez testified in the 2014, and I should say he testified that at the 2014 annexation request presentation, the board members did not ask any questions about any financial concerns or tax abatement issues, but did ask questions about the nature of the patients and what their diagnosis would be of those who would reside in the facility, substance abuse, things of that nature. Absolutely. And of course, they have to ask those questions because the plaintiffs were coming in asking for an accommodation. How else are you going to evaluate if something is a reasonable accommodation, is a reasonable request, unless you have some information about it? How come you're not going to evaluate it based on the quote financials and you don't ask any questions about that? That's absolutely the point, Judge Jones, is it's not Grant Road Public Utility District's burden to go out and say, OK, here's what you have to do to convince us. As with any situation with a plaintiff, with any situation with a party asking for a favor, it's up to them to know what needs to be presented. The Water Code says these are the things that a public utility district is to consider before annexation. I'm not going to argue with you. Do you have in the record any checklist of facts or criteria that an applicant for annexation is supposed to bring before the board? The board does not have a written checklist that they can go, here, applicant, here is the checklist of what you are supposed to do. But it is the applicant's burden to understand what the Water Code says to ask questions beforehand. You know, that was one of the things that was testified to is that at no time prior to... Well, my understanding was they hired someone who's made numerous applications for approvals around at least the Harris County area and never been denied before. So it's just presumably that fellow knew what he was doing. Presumably he should have known what he was doing. But not in the face of two old birds who've been there for 40 years. Speaking as a judge, he's been here for 33. Well, very similar, Judge Jones. I think so. Oh, well, sorry. But that is the exact point. Providence did not do their homework. They did not do their due diligence. They came in and gave a sloppy presentation. Well, you say sloppy. I mean, was there anything testimony that elaborated on that at the trial? At the trial, yes. Mr. Scott specifically testified at the time of trial that he felt that the presentation was sloppy. It did not contain any facts or figures. And so there was nothing really for the board to base any further testimony on. Nothing for them to ask questions on because they hadn't been presented with any of that information. And so, as I say, I'm running low on time. As this court is well aware, deference is to be given to the findings of the trial court. And in this particular situation, the trial judge heard the evidence of both sides, weighed the credibility of that evidence, had to choose between that evidence, and made a determination that there was no discrimination. And he laid out a roadmap of how he got there. And with that, I see I'm out of time. Thank you for your time, judges. Thank you. All right, back to you, Mr. Whitburn. Just out of curiosity, when you, I mean, your client made your presentation, what amount of board time was consumed with the presentation? What amount of board time? Yeah, I mean, you know, they convene the board and you or your client, you're making a, just a ballpark. I mean, like a half a day, just... No, I believe it was more like 15 minutes to half an hour. But the board time was actually, they actually spent more board time and did more of a presentation than they had done in 2009, 2010. Steve Grossman, the architect for plaintiffs, was the same architect that made the presentation, did the same thing and more in 2014 than he did in 2009. In fact, the sloppy presentation reason was never brought up until trial. Jack Scott, the individual who said that, had originally in deposition talked about, well, there was a tax abatement that I was concerned about. So, but he didn't ask any questions at the meeting about that. And in 2014, or in 2017, the trial, he all of a sudden comes up with this sloppy presentation idea. But there's no substance to that. Apart from that, I'd like to make the point at the outset in rebuttal that my colleague here has finally made a critical admission that defendants have contested throughout this entire litigation. He just now got through saying to this court that the plaintiffs came into the September 2014 board meeting requesting a reasonable accommodation. The defendants have contested whether plaintiffs made such a request throughout the entire course of this litigation. Now he's indicating that they did make that request in September 2014. Of course, a request for a reasonable accommodation under the ADA and the FHA puts the burden on the defendants as an affirmative defense to prove that granting such a reasonable accommodation would involve a fundamental alteration or undue burden. So that's a critical admission that I'd like this court to take stock of. The second thing is that the, my colleague made a great deal in his presentation to this court about deference to the trial court. However, deference to the trial court is not automatic. I'd like to draw the court's attention to McCuller versus Nautical Ventures LLC. I don't know all about that, those issues. My question is, he says there is no evidence in the record on appeal about animosity toward people with these disabilities. He said the only evidence is, quote, the board was sensitive to public perceptions. Is that correct or not? That is incorrect, Your Honor. The critical evidence, I believe, is the evidence that Judge Englehart pointed to that in the actual board meetings themselves, the board has admitted it. He testified about the actual board meetings themselves. Right, the board meetings themselves, the only questions the board asked about, and this was true of the September 2014. I'm saying what testimony is there about what you're going to say here? The record cites are at, let's see, 1842 to three, 2073 to four, and 2083 to four. The first two of those record cites were about the September 2014 board meeting. The second was about the November 2014 board meeting. And the record shows that the only questions that any board members asked during the course of the proceedings were about the population. The board members have always admitted that there's a standard process that they go through in determining these issues. If you ask questions about anything that you're concerned about, you ask questions about specifically any issues that might be different from the norm, something that you're not used to. If you need more information, you can defer and you make sure you consult with your tax advisor about any problems. Clearly, the only issue that they were concerned about after this community pressure was applied, after the- Where is your testimony about community pressure? I didn't hear you, Your Honor. Where is your testimony in the record about community pressure? What you're saying is then, I do not take, the fact that they ask just what's wrong with these people, to me, does not necessarily raise an inference of discriminatory intent. So you're saying that that has to be combined with something else. Yes, Your Honor, and the record evidence on the pressure applied to the board appears at 1849 to 50, 2219 to 20, 2103 to 4, and 2143 to 5. The, Patrick Kelly, a real estate developer, spoke with the board, spoke with the board's attorney, repeatedly drummed up complaints in the community about the, about concerns about, specifically about the population, and about the property values decline that would arise if a facility serving a population like this entered into the community. All right, Mr. Whitman, you've got a red light. You have the red light. Thank you, Your Honor. All right, thank you, both sides, for your argument. There's a lot there. We'll look at it and figure it out.